The next case on for argument is United States v. Boylan. I forgot, Mr. Brandon, did you ask to have two for one today? I went for two around the board, yes. You see, I didn't use all two on the first one, and we'll see how much I'll use on the second one. This argument, I represent Mr. Boylan, who the court probably knows was the New York State Assemblyman from March 2003 until December 2011. I filed initially my opening brief, which raised a fair trial issue with regard to the questioning of the undercover officers in this case. After the filing of that brief, the Supreme Court decided McDonald v. United States, which changed the law in large measure with regard to honest services fraud. So I was permitted to file a supplemental brief, and I filed a reply brief as well. So there's been an awful lot of briefing. It might be somewhat difficult for me to condense all that. It's a complicated issue on some level because Mr. Boylan was charged in 21 counts. Nineteen of those relate to two discrete schemes, the carnival scheme and the real estate scheme. Ten counts were the honest services fraud counts. They relate to the real estate scheme. The charge in that case, we now know, and I think the government will concede this, was deficient under McDonald. So the lower court charged what was law at the time. When a public official solicits, agrees to receive, or receives a corrupt payment for or because of his official action, the official has breached his duty of honest and faithful disinterested service. The term official act includes the decisions or actions generally expected of a public official, including but not limited to contacting or lobbying other governmental agencies and advocating for his constituents. So in essence, this charge was official act means what you think it should mean in a general nutshell. That has been overturned by McDonald. In McDonald, an official act is a decision or action on a question, matter, cause, suit, proceeding, or controversy. The question, matter, cause, suit, proceeding, or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is pending or may by law be brought before a public official. To qualify as an official act, the public official must make a decision or take an action on that question, matter, cause, etc. Setting up a meeting, talking to another official, or organizing an event or agreeing to do so without more does not fit that definition of official act. But if he agrees to do an official act, he violates the statute even if he doesn't actually do it. That would be correct, but I think the more important language for my purposes here is setting up a meeting and talking to another official or organizing an event. Those are the key things that are no longer actionable under honest services fraud that would have been at the time of this particular trial. Mr. Brannon, the Chief Justice went on to write, that is not to say setting up a meeting, hosting an event, or making a phone call is always an innocent act or is irrelevant in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. And how does what your client did evade that language? So it's true that you're reading properly from the opinion, of course. But the jury needs to make this determination. On the charge that this jury was given, they could have decided that Mr. Boyland, could have decided improperly, that Mr. Boyland was guilty of honest services fraud because he promised the undercovers to take them on a ride through his district and look at proposed sites. I would argue to you that that's not criminal under McDonnell. He could have said and did say to these undercovers that I will introduce you to other people who might know how you might further your interest in developing the district. And he promised to do that with people that also these undercovers said that they had already met. So I think a jury could- That's true, too. But I think that ultimately we don't know whether there was jury unanimity with regard to things that are in fact illegal under McDonnell or whether they're no longer illegal under McDonnell. I mean, it's unfortunate, obviously, that the case came up after the trial. But this was a very long trial. It was 3,000 to 4,000 pages of trial transcript. Much of what went on was, I would say to you, innocent in nature now given McDonnell. There were things that I think Mr. Boyland would still be guilty of under McDonnell. But I don't know, I don't think we can determine at this point what a properly instructed jury would have determined. That's the problem principally with the honest services count. The other charges that relate to the balance of the real estate charges and the carnival scheme, I believe, are so integrally related to the problem with regard to the honest services charge that they, too, must fail. This is where it gets a little bit difficult to argue these matters orally because you would have to read through very closely all of these charges to see the similarity in the language. But on many occasions, the judge actually uses the term official act. She does not say, remember I charged you about official act with regard to honest services fraud. But it's the only time that that term was ever defined, and she used it repeatedly with regard to all these other charges. So with regard to the Hobbs Act extortion counts, which are 1, 2, 16, and 18, the jury was told that the defendant must have known that the money was offered in exchange for a specific exercise of his official powers. I would argue to you that exercising his official powers is part of the official action language and comes back to McDonnell. So she overcharged with regard to, on those four counts as well. Same with the federal program funds bribery counts. She specifically told the jury in those counts, and they are 3, 4, 17, and 19, that it is not a defense that the count charged or that the official act would have been held for or done anyway. So again, the jury is being told to look at what the official act might have been. They might have concluded that the official act was merely these meetings or setting up these chit-chats. The same holds true with the travel count. So with regard to all the real estate and the carnival counts, it's infected by or cross-pollinated, I believe the government's words might have been, by the improper charge with regard to the honest services counts. I will note briefly, in summation, the government did argue to the jury that these meetings alone, simply having these meetings, would be actionable under the present state of the law, which they would not be any longer. I think the government has made a small concession with regard to that. With regard to counts 20 and 21, which really had nothing to do with official action there, the travel voucher fraud and the misuse of the money issued by the Office for Aging to a nonprofit organization, with regard to those counts, I've argued that the spillover effect has tainted those as well. The government's case, as I told you already, was extremely lengthy. At least 90% of this case had to do with official action as the quid pro quo in both the real estate and carnival cases. He was so dirtied up by the time we got to these more benign charges, which didn't involve big amounts of money that he was trying to solicit from other people. So there you have it. That's my argument. Thank you, Mr. Brandon. And you've reserved two minutes. Thank you, Judge. We hear from the government. Good morning, Your Honors. May it please the Court, my name is Lan Nguyen, and I'm an assistant United States attorney in the Eastern District of New York. I represent the government in this appeal, and I also represented the government at trial. I'd like to just focus on some of the questions and points made by defense counsel. The first, and I think the central issue here, is the government's argument that the error in the honest services charge did not amount to plain error. Sort of speaking to Judge Hall, your point, McDonald did acknowledge and focus on the fact that meetings alone are not always benign acts. And the meetings and the nature of the meetings that were discussed at trial were not benign acts. Boylan was not promising meetings of the sort of neutral nature that was at issue at McDonald. He was promising meetings at which he would either introduce the undercovers to corrupt public officials whom they could bribe, which is a large part of the trial focused on Boylan's assertion that he had a bag man. This was not the sort of neutral meetings that an official procures for their constituents. This was introducing these undercovers to corrupt public officials whom Boylan could arrange a bag man for them to use to bribe these officials. It was at the government's position that once the conversation at the getting to know lapses into that and there's some promise of being able to influence official acts down the line that that fits? That's correct, Your Honor. If you look at the Boylan's specific language in this case, he's promising that he'd had meetings with officials who had then greenlit or had given the green light for certain actions that the undercovers had requested. That city agencies were quote unquote locked up and that we were there. So this is not, again, a neutral meeting where an official sort of sets up what Mr. Brandon refers to as sort of a neutral chit chat. This is a meeting that he had had meetings with other officials whom he had secured official action by those officials on behalf of the undercovers or that he would introduce them to officials who had the ability to make official actions and that he had already sort of primed them to accept bribes for those actions. So this is simply not the same type of meeting as discussed in McDonald. The second point I'd like to make about this is, you know, Mr. Brandon brought up the issue of, you know, how do you know that the jury didn't focus on the sort of more benign aspects? I'd like to point out that the sort of nature of the evidence presented in this case were these hours and hours of recorded conversation, Mr. Boylan's own words. And so there's no difference, it's not like a case where, you know, some of the evidence of the promises or actions Mr. Boylan took came from, you know, a cooperator, for example. All of the evidence of the actions Mr. Boylan promised to take and did take came from Mr. Boylan's own words. And in light of the fact that the jury convicted on both the honest services fraud counts as well as the counts based on the counts that had statutes that were not honest services fraud, it appears from that that the jury acknowledged and accepted based on all the words that Mr. Boylan made. They accepted as truthful what Mr. Boylan claimed he would do and what he said he would do. Okay. So is there anything in the government's view, and I will ask Mr. Brandon this when he stands up to give rebuttal, that in the course of these, sorry, that are meetings that could be benign, I mean it seemed to me from reading the evidence of the record in this case that what we have is almost invariably a series of meetings in which either I've gone and gotten this official action for you or I will go get this official action for you. That's correct, Your Honor. Are there anything that fall outside of that, in fairness to Mr. Boylan, where the jury could have mistaken, or sorry, taken benign, I'll use that word, meetings, or what would be benign now under McDonald and confuse those with malignant meetings? Actionable. You're actionable. That's a better word. No. You'll have a chance, Mr. Brandon. The sort of second issue that Mr. Brandon brought up was the idea that official act, because of the error in the courts on a services fraud instruction, that that somehow tainted the sort of rest of the statutes that Boylan was charged with. The government obviously would disagree with that as we went through in our papers. And more specifically, it doesn't reflect that each of those statutes are separate and distinct with their own separate and distinct elements. Focusing just for a minute on the Hobbs Act extortion, the language that Mr. Brandon cited to comes directly from the Supreme Court case, United States v. Evans, which basically provides the guidance that the Supreme Court said was required for a jury to find that a quid pro quo had been met. It did not cross, you know, unlike in McDonald, the Boylan case, the judge did not incorporate Section 201's meaning of official action into the language. And in this court's decision in Ganeem, this court has been very careful to say, you know, Finally, your honors, with respect to counts 20 and 21, the government strongly disagrees with Mr. Brandon's characterization of the Wayside and Per Diem schemes. You know, the evidence of Mr. Boylan's involvement in those schemes was extensive. There are mountains of, there are hundreds of pages of documentary evidence presented, New York State contracts, invoices, emails between Hermon, Boylan's then Chief of Staff and a government witness at trial, and Boylan, including one cited in the government's brief that shows Mr. Boylan's direct involvement and control over the money that was steered to Wayside. Attendance and easy pass records, 200 false vouchers, and emails in support of the Per Diem scheme. Multiple witnesses testified about Mr. Boylan's involvement in those schemes. Vendors, executive directors of a non-profit, with respect to Per Diem schemes, the evidence was very strong that Mr. Boylan was shown to be in different places at times where he claimed to be in Albany, including Turkey, North Carolina, meeting with the undercover agents in Manhattan, not in Albany. And finally, the amount of money implicated in both the Per Diem and Wayside schemes is actually much greater than the amount of money actually taken by Mr. Boylan as part of either the two corruption schemes, the carnival scheme and the real estate scheme. In 2008 alone, Boylan took $56,000 in state funds and steered it towards his own events. And that with respect to the Per Diem scheme, which lasted over three years, he pocketed $71,000. To the extent that your honors don't have any further questions, the government rests on its papers. Okay, thank you. Mr. Brandon. But that is far less than the $250,000 he requested with regard to the real estate scheme. And I will address your other questions since you've invited me to do so. But in that regard, I'll note that the undercovers and Mr. Boylan first met to discuss potential development sites in his district in March of 2011. By May of 2011, just two months later, the undercovers reported to his chief of staff that they were so disgusted with his lack of productivity that in fact nothing had happened, that they were no longer going to have discussions about real estate development. This was so embryonic what they were talking about. This really was let me drive you around to these sites. I will introduce you vaguely to people who might be able to help you. On some occasions, there was money discussed also, such as I'll introduce you to people that you may be able also to give money to corruptly. But that was not always the case. There was nothing pending as McDonald would require. There was nothing by law that could be brought at that time. And the whole thing fizzled in a matter of two months because he did nothing. He didn't further any of the quote-unquote agenda that the undercovers would have had him follow. So you're saying that those are the meetings, those are the kinds of interactions. Those would be the benign ones. He strung them along, correct. The jury might have then confused because it wasn't, we all weren't aware of the law because McDonald had not. Correct. Okay. And I think, I don't know of the, whether this is correct jurisprudentially, but had the lawyers known of McDonald, defense lawyers, before starting this trial, I think they would have tried it on a completely different theory. I think they would have argued that all these meetings were essentially innocent under McDonald. They would have argued that all throughout, and they did sort of touch on this as their defense, all throughout Mr. Boylan was stringing these guys along for whatever reason he may have had. Unclear. Okay. Thank you. Thank you, Mr. Brandon. Thank you both. We will reserve decision.